# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| ELIZABETH KEEFER, ) | CASE NO. 1:09-cv-2390 |
| ) | |
| Plaintiff, ) | |
| ) | JUDGE POLSTER |
| v. ) | |
| ) | MAGISTRATE JUDGE VECCHIARELLI |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | **REPORT & RECOMMENDATION** |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the magistrate judge on referral. Plaintiff, Elizabeth Keefer, ("Keefer"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying Keefer's application for a period of Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. § 416 (i). This court has jurisdiction pursuant to 42 U.S.C. § 405(g).

For the reasons set forth below, the decision of the Commissioner should be VACATED and REMANDED.

### I. Procedural History

Keefer filed her application for DIB on September 23, 2003. Her application was denied initially and upon reconsideration. Keefer timely requested an administrative hearing.

Administrative Law Judge ("ALJ"), Cheryl M. Rini, held a hearing on March 30, 2006, at which Keefer, who was represented by counsel, Chester Plotkin, M.D., medical expert ("ME"), and Brett Salkin vocational expert ("VE") testified. The ALJ issued a decision on May 22, 2007, in which she determined that Keefer was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review. Keefer filed an appeal to this Court.

On appeal, Keefer claims that the ALJ erred by: (1) rejecting the medical opinions of record regarding Keefer's mental limitations; and (2) failing to include limitations resulting from Keefer's mental impairments in her hypothetical question to the VE and in her RFC determination. The Commissioner disputes these claims.

### II. Evidence

#### A. Personal and Vocational Evidence

Keefer was born on July 23, 1964. (Transcript ("Tr.") 73). She completed a GED in 1982 and completed two semesters of college courses. (Tr. 255). She has previous work experience as a machine operator, office assistant, packager, and salesperson. (Tr. 76).

**B. Medical Evidence**[1]

On August 15, 2002, Keefer presented to Anne Wise, M.D. for low back pain. Keefer was tearful and had decreased concentration and memory.  (Tr. 206-207).

On January 13, 2004, Keefer presented to MetroHealth System ("MetroHealth") for follow-up for fatigue.  She was diagnosed with depressive disorder NEC and given a trial of Prozac.  (Tr. 341-342).

On March 2, 2004, Keefer presented to Deborah Koricke, Ph.D. for a consultive examination.  Keefer reported that she had been depressed for as long as she could remember, and all she wants to do is cry or sleep.  Other than marriage counseling, she had not had any psychological treatment.  (Tr. 255).  Dr. Koricke noted that Keefer was depressed and sullen and had a flat affect.  Dr. Koricke diagnosed adjustment disorder with mixed anxiety and depressed mood.  She assessed Keefer with a GAF score of 50[2].  (Tr. 256-267).  Dr. Koricke opined that Keefer was moderately impaired in  her ability to relate to others; understand, remember, and follow instructions; maintain concentration, persistence, and pace; and withstand work stress.  (Tr. 258).

On March 18, 2004, Keefer presented to Dr. Liu for follow-up.  Keefer reported that she did not feel any difference being on Prozac for six weeks.  Keefer reported that she would like to switch therapy and undergo counseling.  Dr. Liu assessed Keefer with

---

[1] Only evidence regarding Plaintiff's mental impairments is relevant to her appeal. Therefore, summary of the evidence is limited to this issue.

[2] A GAF score between 41 and 50 indicates serious symptoms or a serious impairment in social, occupational, or school functioning.  A person who scores in this range may have suicidal ideation, severe obsessional rituals, no friends, and may be unable to keep a job.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. revised, 2000).

3

depressive disorder NEC. He prescribed Effexor and referred Keefer for a psychiatric assessment and psychological counseling. (Tr. 336).

On May 7, 2004, Bonnie Katz, Ph.D. completed a psychiatric review technique. (Tr. 260-265). Dr. Katz opined that Keefer had moderate limitation in her activities of daily living and in maintaining social functioning. She opined that Keefer had moderate difficulties in maintaining concentration, persistence and pace, but noted that given the recent onset and diagnosis, she did not expect the current severity to last 12 months. (Tr. 263, 265).

On July 21, 2004, Keefer presented to psychiatrist Daniel Ionescu, M.D. Keefer reported depressed mood; decreased sleep, energy, interest and concentration; and panic attacks. Dr. Ionescu diagnosed major depressive disorder, panic disorder with agoraphobia, and assessed Keefer with a GAF score of 40-45[3]. (Tr. 322-325).

On August 12, 2004, Keefer presented to Dr. Ionescu. She reported continued crying spells and withdrawal and stated that she could not get out of bed. (Tr. 301).

On August 27, 2004, Keefer presented to Dr. Ionescu. She reported that she was not doing well and was aggravated by minor things. She reported poor concentration and a lot of anxiety. (Tr. 293).

Keefer continued to treat with Dr. Ionescu on September 15, 2004 (Tr. 286), October 11, 2004 (Tr. 282), October 26, 2004 (Tr. 278-279), and November 2, 2004 (Tr.

---

[3]A GAF score between 31 and 40 indicates some impairment in reality testing or communication or major impairment in several areas such as work or school, family relations, judgment, thinking, or mood. A person who scores in this range may have illogical or irrelevant speech, and may avoid friends, neglect family, and be unable to work. *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

4

267-77). During these visits, Keefer continued to report problems with depression and anxiety.

On February 10, 2005, Keefer presented to MetroHealth complaining of worsening panic attacks. (Tr. 455A). Keefer reported that she had flushed her medicines down the toilet about five months ago because she was feeling better and thought that she no longer needed them. She felt fine for three months, however she started having panic attacks after she stopped taking the medication. She also had crying spells and some depression. (Tr. 455A). Keefer is reported taking Paxil and Ativan. Keefer was diagnosed with depression with acute anxiety and assessed with a GAF score of 40-50. She was advised to continue her medication and follow up with her psychiatrist. (Tr. 456).

On May 31, 2005, Dr. Ionescu completed a mental assessment. (Tr. 362-363). Dr. Ionescu opined that Keefer had marked impairments in performing daily activities; maintaining concentration and attention for extended periods; sustaining a routine without special supervision; understanding, remembering, and carrying out instructions, responding to work pressures; responding appropriately to supervision; performing complex, repetitive, or varied tasks; and behaving in an emotionally stable manner. (Tr. 362-63). He further opined that Keefer had mild limitations in performing simple tasks and moderate limitations in responding appropriately to work changes and maintaining regular attendance. (Tr. 362-63). Dr. Ionescu indicated that he did not know whether Keefer's limitations had lasted or could be expected to last for at least 12 months, and he could not assess when her impairments became severe. (Tr. 363). He opined that Keefer would miss work more than three times a month due to her impairments.

5

(Tr. 363).  He explained that a psychological assessment was not obtained prior to completing the assessment because Keefer was seen for the purposes of treatment, not the assessment of functional capacity.  (Tr. 363).

Keefer continued treatment with Dr. Ionescu in June and July 2005 and reported crying, panic attacks, disrupted sleep, increased depression and anxiety, and exhaustion.  (Tr. 438, 442-444, 494).

On July 5, 2005, Dr. Ionescu completed another mental assessment.  (Tr. 374-75).  Keefer's limitations either remained stable or improved since the previous assessment.  Specifically Keefer's limitations improved from marked to moderate in terms of her ability to maintain concentration, respond to supervision, respond to work pressures, and perform complex tasks.  (Tr. 374-75).  Keefer's limitation improved from moderate to mild in terms of her ability to relate to other people and use good judgment.  Her ability to understand, remember, and carry out instructions improved from markedly impaired to mildly impaired. (Tr. 374).  Dr. Ionescu still offered no opinion as to when her impairments became severe.  (Tr. 375).

On July 16, 2005, Keefer presented to the emergency room with a one week history of worsening depression and anxiety.  She was assessed with depression with anxiety and advised to follow-up with her psychiatrist.  (Tr. 494-496).

In late July and August 2005, Keefer reported doing better and noticed definite improvement.  (Tr. 428, 432).  Dr. Ionescu noted that Keefer had no medication side effects, and found that Keefer was stressed but stable and less depressed and anxious (Tr. 429, 433).

On January 4, 2005, Keefer presented to Dr. Emad Daoud for follow-up for pain

6

management. Dr Daoud noted that upon examination, Keefer was somewhat tearful and depressed. (Tr. 358).

On September 30, 2005, Keefer presented to Dr. Winkelman for a neurological evaluation. Dr. Winkelman noted that Keefer's recurrent dizzy spells and other neurological symptoms were most likely caused by panic attacks. (Tr. 411, 414).

On November 7, 2005, Keefer presented for medication management. She reported that she was continuing to experience depression and was having anxiety attacks that felt different from her previous attacks. She reported that when she has an attack, she feels dizzy, weak, and has headaches. At these times, she wonders whether she is having a stroke. (Tr. 586).

On November 29, 2005, Keefer presented to Dr. Liu for back pain. Dr. Liu noted that he could not explain Keefer's pain but suspected that she has somatization disorder given her history of unexplained and disabling weakness, anxiety, and depression. (Tr. 578).

On January 3, 2006, Keefer reported to Dr. Syed for medication management. Dr. Syed noted that Keefer's memory and concentration are poor due to pain. Dr. Syed noted improvement in Keefer's mood and anxiety since her last visit. Keefer was diagnosed with major depressive disorder, generalized anxiety disorder, and panic disorder. (Tr. 564).

On April 11, 2006, Dr. Syed completed a mental assessment. Dr. Syed opined that Keefer had marked impairments in: daily activities; relating to others; maintaining concentration and attention; maintaining a regular schedule; relating to co-workers; responding to work pressures; responding to changes in the work setting; and behaving

7

in an emotionally stable manner. (Tr. 120). She further opined that Keefer had mild limitations in: her ability to sustaining a routine without special supervision; understand remember, and carry out instructions; and use good judgment. (Tr. 120-21). She was moderately limited in her ability to respond appropriately to supervision. Dr. Syed opined that Keefer's symptoms existed since at least May 15, 2002. She further opined that Keefer could be expected to miss work more than three times a month. (Tr. 120-121).

### C. Hearing Testimony

Keefer testified that she does not work due to pain, fatigue , and "mental breakdown because of pain". (Tr. 853). Keefer has panic attacks one to two times per week that last from an hour to days at a time. (Tr. 855). During a panic attack she cannot concentrate, has blurred vision, weakness, headache, numbness, shortness of breath, and heart palpitations. (Tr. 856). At times, Keefer does not leave the house because the pain and fatigue make it, "too much to bother with." (Tr. 857). Keefer experiences crying spells approximately three times per week. (Tr. 857). She has difficulty dealing with others, and simple tasks can overwhelm her. (Tr. 859). Keefer does household chores to the extent she is able and helps her children with their homework, although she has difficulty focusing. (Tr. 860).

The ME testified that Keefer's has major joint dysfunction, bilateral plantar faciitis, disc problems, depression, anxiety, and fibromyalgia; however, none of these impairments met or equaled a listing. (Tr. 831-32). The ME testified that Keefer's only functional limitation was the need to rest after standing or walking 30 to 40 minutes. He further testified that her psychological problems did not cause any limitations. (Tr. 832).

8

The ALJ asked the VE to assume an individual with Keefer's vocational characteristics who can: (1) lift or carry 20 pounds occasionally and 10 frequently; (2) sit six hours in an eight hour day; and (3) stand or walk six hours with a sit/stand option that allows her to change positions at will, remaining at the work station during position changes. The individual cannot climb ladders, ropes, or scaffolds but can perform all other postural maneuvers on a frequent basis. (Tr. 866). The VE testified that such a person could perform Keefer's past relevant work as an office assistant and office assistant manager. (Tr. 866). The ALJ then added to the first hypothetical a restriction of low stress work without high production or rapid production quotas. The VE stated that this would eliminate the manager position. (Tr. 866-67).

Keefer's counsel asked the VE to add a restriction that the individual could not behave in an emotionally stable manner for 33-48% of the work day. The VE testified that there would be no work available for such an individual. (Tr 868-69). The VE also testified that if the individual were absent from work three days per month, or if she were moderately impaired in her ability to relate to others, she would not be able to perform any job in the economy. (Tr. 869-70).

### III. Standard for Disability

A claimant is entitled to receive benefits under the Act when she establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted

or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a). To receive SSI benefits, a recipient must also meet certain income and resource limitations. 20 C.F.R. § 416.1100 and 20 C.F.R. § 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience. 20 C.F.R. § 404.1520(d) and 20 C.F.R. §416.920(d). Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

### IV. Summary of Commissioner's Decision

The ALJ made the following findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through September 1, 2007.
>
> 2. The claimant has not engaged in substantial gainful activity since May 15, 2002, the alleged onset date....
>
> 3. The claimant has the following severe impairments: degenerative disc

10

and joint disease of the lumbar spine, fibromyalgia, major depressive disorder, anxiety disorder not otherwise specified, and bilateral plantar fasciitis....

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1....

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work at the light level of exertion. Specifically, she can lift/carry 20 pounds occasionally and 10 pounds frequently. She can sit for at least 6 hours during an 8-hour workday. She can stand/walk for at least 6 hours in an 8-hour workday, with a sit/stand option such that she can change positions at will from either begin [sic] on her feet to sitting, or from sitting to being on her feet; assuming also during these positional changes she remains at the workstation. She cannot climb ladders, ropes, or scaffolds. She can perform all other postural maneuvers on a frequent basis. She can perform low stress work meaning no high production or rapid production quotas.

6. The claimant is capable of performing past relevant work as an Office Assistant as that job is normally performed in the national economy. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity....

6. The claimant was born on December 3, 1962 and was 42 years old, which is defined as a younger individual age 18-44, on the date the application was filed....

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 15, 2002 through the date of this decision....

(Tr.19-20, 29-30).

## V. Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the administrative law judge's findings of fact and whether the correct legal standards were applied. See *Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings

11

and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

## VI. Analysis

On appeal, Keefer claims that the ALJ erred by: (1) rejecting the medical opinions of record regarding Keefer's mental limitations; and (2) failing to include limitations resulting from Keefer's mental impairments in her hypothetical question to the VE and in her RFC determination. The Commissioner disputes these claims.

### A. Treatment of Medical Opinions

Keefer alleges that the ALJ erred by failing to give controlling weight to the opinions of her treating psychiatrists, Dr. Ionescu and Dr. Syed, as well as failing to properly weigh the opinions of state examiners. She further alleges that the ALJ improperly relied on her own lay opinion, rather than the medical opinions in the record. Keefer is partially correct.

The medical opinion of treating physicians should be given greater weight than those of physicians hired by the Commissioner. *Lashley v. Secretary of Health and Human Servs.*, 708 F.2d 1048 (6th Cir. 1983). Medical opinions are statements about the nature and severity of a patient's impairments, including symptoms, diagnosis, prognosis, what a patient can still do despite impairments, and a patient's physical or

12

mental restrictions. 20 C.F.R. § 404.1527(a)(2). However, attributing greater weight to a treating physician is required only when the treating physician's opinion is based on sufficient objective medical data and is not contradicted by other evidence in the record. 20 C.F.R. §§ 404.1527(d)(3), 416.927(d)(3); *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 & n.7 (6th Cir. 1991); *Sizemore v. Secretary of Health and Human Services*, 865 F.2d 709, 711-12 (6th Cir. 1988). Where there is insufficient objective data supporting the treating physician's opinion and there is no explanation of a nexus between the conclusion of disability and physical findings, the fact finder may choose to disregard the treating physician's opinion. *Landsaw v. Secretary of Health and Human Servs.,* 803 F.2d 211, 212 (6th Cir. 1986). The fact finder must, however, articulate a reason for not according the opinions of a treating physician controlling weight. *Shelman v. Heckler*, 821 F.2d 316 (6th Cir. 1987).

Even when a treating physician's opinion is found not to be entitled to controlling weight, it is still entitled to deference:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *4.

When the adjudicator determines that the treating source's opinion is not entitled to controlling weight, he is required to articulate good reasons for the weight given to the treating source's medical opinion. 20 C.F.R. §§ 404.1527(d) (2) and 416.927.

13

> [T]he ...decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.

Social Security Ruling 96-2p, 1996 WL 374188, at *5.

In this case, the ALJ's reasons for failing to give controlling weight to Dr. Ionescu's and Dr. Syed's opinions are sufficient and adequately articulated. As set forth, to be entitled to controlling weight, treating physicians opinions must be supported by objective medical evidence. As the ALJ noted, neither Dr. Ionescu, nor Dr. Syed based his/her opinion on a psychological evaluation. In his May 2005 assessment, Dr. Ionescu noted that he did not perform a psychological evaluation because he saw Keefer for treatment purposes, not for the purpose of assessing functional capacity. In his July 2005 assessment, Dr. Ionescu noted that he did not perform a psychological evaluation because Keefer's condition could be assessed on a clinical basis. Likewise, Dr. Syed noted that she did not perform a psychological evaluation because she believed a clinical evaluation was sufficient. This is a valid consideration by the ALJ. *See Young v. Sec'y of Health and Human Servs.*, 925 F. 2d 146, 151 (6th Cir. 1990) ("Dr. Warner did not conduct a mental health status examination or any psychological or psychiatric tests in forming her opinion. The opinion of a treating physician must be based on sufficient medical data.").

Additionally, the ALJ found that Dr. Ionescu's and Dr. Syed's opinions were contradicted by other evidence in the record. Specifically, the ALJ noted that Keefer's condition had improved and that her symptoms were controlled with medication, as evidenced by Dr. Ionescu's and Dr. Syed's treatment notes, as well as Keefer's

14

testimony.

The ALJ further noted that Dr. Ionescu could not determine, in either assessment, how long the severity of Keefer's limitations had been present. Moreover, although Dr. Syed opined that Keefer's limitations became severe as of at least May 2002, Dr. Syed did not begin treating Keefer until January 2006, and there was no indication that Dr. Syed reviewed Keefer's mental health history.

Although the ALJ properly denied controlling weight to Keefer's treating psychiatrists' opinions, she did not properly weigh the opinion of consultive examining psychologist, Dr. Koricke or state agency consultant, Dr. Katz.[4]

20 CFR 404.1527(f) provides in part:

(2) Administrative law judges are responsible for reviewing the evidence and making findings of fact and conclusions of law. They will consider opinions of State agency medical or psychological consultants, other program physicians and psychologists, and medical experts as follows:

(ii) When an administrative law judge considers findings of a State agency medical or psychological consultant or other program physician or psychologist, the administrative law judge will evaluate the findings using relevant factors in paragraphs (a) through (e) of this section, such as the physician's or psychologist's medical specialty and expertise in our rules, the supporting evidence in the case record, supporting explanations provided by the physician or psychologist, and any other factors relevant to the weighing of the opinions. **Unless the treating source's opinion is given controlling weight, the administrative law judge must explain in the decision the weight given to the opinions of a State agency medical or psychological consultant or other program physician or psychologist**, as the administrative law judge must do for any opinions from treating sources, nontreating sources, and other nonexamining sources who do not work for us. (Emphasis added)

Social Security Ruling 96-6p, 1996 WL 374180 provides in part:

---

[4]Indeed, the ALJ's analysis of the consulting physicians' opinions is in stark contrast to her detailed analysis of the treating physicians' opinions.

15

> 1. Finding of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge ...levels...
>
> 2. Administrative law judges ...may not ignore these opinions and must explain the weight given to these opinions in their decisions.

Although the ALJ summarized Dr. Koricke's findings in her recitation of the evidence, she failed to evaluate or weigh Dr. Koricke's opinion. In her recitation of the evidence, the ALJ notes that Keefer was seen for a consultive psychological examination in March 2004. The ALJ never identifies the consultive examiner, but review of the record indicates that it is Dr. Koricke. (Tr. 254-258). The ALJ summarizes Dr. Koricke's findings, including her conclusion that Keefer is moderately impaired in: her ability to relate to others, including fellow workers and supervisors; her ability to understand, remember, and follow instructions; her ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks; and her ability to withstand the stress and pressures associated with day to day work activity. (Tr. 24-25). While the ALJ presented a rather detailed summary of Dr. Koricke's report, she failed to consider or weigh Dr. Koricke's opinion in her discussion of the opinion evidence. (Tr. 28-29).

The Commissioner does not dispute that the ALJ failed to weigh Dr. Koricke's opinion, but argues instead that the ALJ's failure is harmless error. The Commissioner is wrong. Dr. Koricke opined that Keefer was moderately impaired in all assessed areas; moderate impairment in all areas would require greater limitations than those imposed by the ALJ, to wit: low stress work with no high or rapid production quotas.

16

See *Ealy v. Comm'r. of Soc. Sec.*, 594 F.3d 504, 516 (6th Cir. 2010) and cases cited therein. Additionally, Dr. Koricke's opinion is consistent with portions of the treating psychiatrists' opinions.

The ALJ also fails to adequately explain the weight given to Dr. Katz's opinion. Dr. Katz found that Keefer had was moderately impaired in her ability to maintain concentration, persistence, and pace. However, Dr. Katz added that given the recent onset, she did not expect the severity to last 12 months. The ALJ disregarded Dr. Katz's opinion regarding the duration of the severity because, "evidence received at the hearing level demonstrates that Ms. Keefer is more limited than determined by the State Agency consultant". (Tr. 29). However, the ALJ never explained to what evidence she was referring, nor did she explain how this evidence affected her findings beyond disregarding Dr. Katz's opinion about the duration of the severity.

Lastly, Keefer argues that the ALJ erred by disregarding all the medical opinions and substituting her lay opinion regarding Keefer's mental limitations. The court cannot conclude that the ALJ relied on her lay opinion because the court cannot determine how the ALJ reached her RFC determination. The ALJ found that Keefer is limited to low stress work meaning no high production quotas or rapid production quotas. However, the ALJ does not articulate the medical basis for her finding. If the ALJ gave any weight to the opinions of Drs. Ionescu, Syed, Katz, or Koricke, she failed to articulate what portion of the opinion she credited or how it supports her RFC determination. Moreover, while the ALJ stated, in discussing Keefer's physical limitations that she gave great weight to the ME's opinion, his opinion alone does not support the ALJ's findings regarding Keefer's mental limitations because the ME found that Keefer had no mental

17

limitations. Thus, while the ALJ's findings may be supported by substantial evidence in the record, the court cannot make that determination because the ALJ failed to articulate the basis for her finding.[5] Accordingly, the ALJ's decision deprives the court the opportunity to engage in any meaningful review. See *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996) ("we cannot uphold a decision by an administrative agency ... if, while there is enough evidence in the record to support the decision, the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result.").

Moreover, the court cannot excuse the denial of a procedural protection simply because substantial evidence may otherwise support the decision. Wilson v. Comm. of Soc. Sec., 378 F. 3d 541,546 (6th Cir. 2004).

**B. The Vocational Expert's Testimony**

Keefer argues that the ALJ's decision is not supported by substantial evidence because the ALJ failed to adequately portray Keefer's mental limitations in her hypothetical question to the VE. A hypothetical question must precisely and comprehensively set out every physical and mental impairment of the applicant that the ALJ accepts as true and significant. *See Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987). Where the hypothetical question is supported by the evidence in the record, it need not reflect unsubstantiated allegations by claimant. *See*

---

[5]The ALJ states that her RFC assessment is based on an independent review of the evidence, including hearing testimony and other evidence received at the hearing level. (Tr. 29). This conclusory statement is insufficient to, "build an accurate and logical bridge between the evidence and the result." See *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)

*Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990). Because the court is unable to determine the basis for the mental limitations in Keefer's RFC assessment, it would be premature to address the issue of whether the ALJ's hypothetical accurately reflected Keefer's mental impairments.[6]

### VII.  Decision

For the foregoing reasons, the decision of the Commissioner should be VACATED and REMANDED.

Date: August 6, 2010                                           s/ Nancy A. Vecchiarelli
                                                                              U.S. Magistrate Judge

### **OBJECTIONS**

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111.**

---

[6] Keefer argues that the ALJ's hypothetical question is insufficient because it fails to address the ALJ's finding that Keefer has moderate limitations regarding concentration, persistence, and pace.  This finding is made in connection with the ALJ's step three analysis and the court expresses no opinion as to whether it is relevant to the RFC determination.  However, the issue of what is a sufficient hypothetical question is clouded by this finding, as well as the ALJ's statement that."there is no compelling evidence that [Keefer] cannot perform the mental demands of simple routine tasks that are not fast paced".  (Tr. 26).  Accordingly, this issue should be addressed on remand.